UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH EDWARD ABRAHAM,

                                  Petitioner,                    Case Number 2:10-CV-11387
                                                                 Honorable Paul D. Borman

v.

KEN MCKEE,

                                  Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Joseph Edward Abraham filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Oakland Circuit Court of conspiracy to possess with intent to deliver over 650 grams of cocaine. MICH. COMP. LAWS § 333.7401(2)(a)(i). The trial court sentenced him to thirty-to-sixty years in prison. The Court finds that Petitioner's first four claims are without merit and that his remaining nine claims are procedurally barred from review. The petition will therefore be denied.

I.

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant's conviction arises from allegations that he engaged in a long-term drug trafficking conspiracy with Roderick Lee and Nathaniel Lee, who allegedly led and equally controlled the purported Lee family organization, and others. Defendant allegedly was the primary supplier for the organization. Roderick and others, in turn, allegedly supplied numerous individuals, who sold to third parties.
>
> Eric Lee, who is the nephew of Roderick and Nathaniel, began working for Roderick in 1989, and continued selling cocaine and heroin for his uncles until 1996.

Eric testified n2 that Roderick and Nathaniel led the Lee organization and were equally in control. In 1989, Nathaniel lived with Eric's mother and kept more than a kilogram of cocaine in their apartment. Eric, then fourteen years old, began stealing portions of the cocaine to sell. After Eric's activities were discovered, Roderick began supplying Eric weekly with cocaine to sell. Eric initially began with half-ounce amounts, which eventually grew to over half a kilogram. Eric testified that, on one occasion, he observed over a kilogram of powder cocaine and over a kilogram of crack cocaine at Roderick's apartment. Roderick was in the process of converting the powder into crack cocaine.

FOOTNOTES

n2 Eric was unavailable for trial, so the court admitted his preliminary examination testimony.

Over the years, Eric observed large quantities of drugs being delivered to Roderick and Nathaniel. Eric observed defendant and Roderick together, and believed that the delivery individuals were "running" for defendant. In 1995, Eric heard defendant tell Roderick that he "had to pay." Later that day, Eric saw defendant at Roderick's house, and Roderick gave Eric some heroin to get tested. Eric testified that, in total, Roderick supplied him with more than 650 grams of cocaine for sale and distribution to third parties. Eric indicated that Roderick also supplied drugs to several other people, including Demar Garvin, Louis Laws, John Stanley, and LaMark Northern.

Northern testified that he first received cocaine from Roderick in 1987 or 1988, and also received cocaine from Garvin, who purchased his cocaine from defendant and Roderick. For years, beginning in approximately 1993, Northern routinely received cocaine and heroin from Roderick and Garvin, totaling more than 650 grams, which he broke down into smaller quantities and sold to third parties in the Pontiac area. In 1995, Northern and Garvin were at defendant's house when defendant offered to "front" them drugs to sell in exchange for sharing the profits, but Northern opted to purchase the drugs from defendant. Subsequently, Northern bought at least a half-kilogram of drugs directly from defendant between five and ten times. Northern typically pooled his money with Rashad Anthony and Marvin Smith to buy the drugs. At least twice, Northern and Garvin pooled their money to buy drugs from defendant and once bought a full kilogram. On one occasion, Northern, Roderick, and Garvin went to defendant's house and purchased between eight and ten kilograms of cocaine for $ 200,000. Northern stopped buying drugs from defendant because he owed defendant money.

Antonio James, a drug runner for Joseph Steins (sic), testified that, from 1994 to 1997, he picked up cocaine from defendant in quantities of between one and three

*kilograms* about twenty times over the course of a couple of years. In 1996, James saw a shipment of between twenty and twenty-five kilograms of cocaine delivered to defendant's house. James testified that, in 1996 or 1997, he heard defendant brag to Steins that his "Pontiac boys," Roderick and Nathaniel, were selling more drugs than the Steins organization.

In December 1996, the police observed defendant carry a gray box into a Romulus Fairfield Inn room, and leave empty-handed minutes later. Two days later, the police observed three men leave the room. The police stopped their van and confiscated a total of $ 57,800. A drug-sniffing canine alerted the police of drug residue on the money. In the motel room, the police found a gray box in the garbage, along with paper that matched paper that was used to bundle $ 46,000 of the confiscated money.

On December 11, 1997, someone from New York made three calls to defendant's Belleville residence. On the same day, someone at defendant's house called a Belleville Red Roof Inn. On the next day, someone at the Red Roof Inn twice called defendant's house. On that same day, the police observed two men enter the same Red Roof Inn room. Shortly thereafter, defendant and another man entered the room. Minutes later, the four men left the room, one carrying a brown paper bag, and ultimately went to defendant's house. Defendant and a woman subsequently left, rented a van, and returned to defendant's house. Another car arrived and, at 1:20 a.m., the car and the van left the house. When the police stopped and searched the van, which carried defendant, several other men, and a woman, the police confiscated $ 1,642 from defendant, and $ 2,900 from another man. A drug-sniffing canine alerted the police of drug residue on the money. Inside the car, which was being driven by Steins, the police found $ 4,100 in the center console, which also indicated positive for drug residue.

In September 1998, search warrants were executed for ten homes purportedly connected to the Lee family organization, and numerous individuals allegedly involved in the conspiracy were arrested. Defendant was among those arrested. In a statement made to the police, defendant admitted that he received large quantities of cocaine from out of state, including New York, which he brokered to different drug organizations, including the Lee brothers and Steins (sic). Defendant stated that he had received shipments a couple times a week for two or three years. The shipments were usually for two or three kilograms of cocaine, but he once received a shipment of thirty kilograms. Defendant indicated that he supplied "the Pontiac group" with drugs once or twice a week for two or three years, and that Roderick and Garvin came to his area to purchase drugs. Defendant admitted that, on one occasion, he sold twenty kilograms of cocaine to Roderick for $ 500,000. Abraham explained that their drug transactions added up to between fifteen and twenty multi-kilogram drug deals. Defendant stated that, in total, he had sold about two hundred kilograms of cocaine in his life.

3

Inside defendant's Belleville residence, the police found a loaded semi-automatic gun, a thirty-caliber gun, three cell phones, and an address book that contained phone numbers for Roderick and two New York individuals. The police confiscated phone records that showed several calls between defendant's residence and Roderick's residence. They also showed numerous calls between defendant's residence and two New York individuals whom defendant identified as his drug sources.

*People v. Abraham*, 2005 Mich. App. LEXIS 672, *1-7 (Mich. Ct. App. Mar. 15, 2005).

Following his conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals.  His appointed appellate counsel filed a brief that raised the following claims:

I. Petitioner's right not to be put twice in jeopardy was violated when the trial court declared a mistrial without his consent and without manifest necessity.

II. There was insufficient evidence to prove beyond a reasonable doubt that there was an actual conspiracy.

III. The prosecutor committed misconduct when she intimidated witness Eric Lee, which caused him to invoke his Fifth Amendment rights.

IV. Petitioner is entitled to resentencing because he did not waive sentencing before the judge who presided over the trial.

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion.

*Id.* Petitioner attempted to file a pro so supplemental brief, raising additional claims, but on March 8, 2005, the Michigan Court of Appeals rejected it as untimely.

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, which raised the following claims.

I. Petitioner's right not to be put twice in jeopardy was violated when the trial court declared a mistrial without his consent and without manifest necessity.

II. There was insufficient evidence to prove beyond a reasonable doubt that there was an actual conspiracy.

III. The prosecutor committed misconduct when she intimidated witness Eric Lee, which caused him to invoke his Fifth Amendment rights.

4

IV. Petitioner is entitled to resentencing because he did not waive sentencing before the judge who presided over the trial.

V. Petitioner was denied the effective assistance of appellate counsel because his counsel failed to assist him in timely filing his Standard 4 Supplemental Brief to the Michigan Court of Appeals.

The Michigan Supreme Court denied the application in a standard order. *People v. Abraham*, 474 Mich. 933 (2005)(table).

Petitioner returned to the trial court and filed a motion for relief from judgment, which contained the following claims.

I. There was insufficient evidence to support the prosecutor's theory that it was a 13-year conspiracy. Further, the charges prejudiced him because they were brought after the statute of limitation had expired.

II. The trial court erred when it admitted statements that Petitioner made to law enforcement in violation of his constitutional rights. Additionally, any interrogation was in violation of Miranda v. Arizona because Petitioner never waived his rights.

III. Petitioner was denied his right to be present at a critical stage when his trial counsel waived his right to be present for oral argument, discussion of jury instructions, and discussion of notes from the jury during deliberations.

IV. The trial court erred when it admitted the testimony of multiple witnesses because their testimonies were purely hearsay and they prejudiced him.

V. The police committed misconduct when they failed to distinguish between Petitioner and his brother and when they lied about the color of the box that the police dog alerted to. Further, the prosecutor committed misconduct by failing to correct the testimony.

VI. Petitioner was denied his right to confrontation and cross examination of prosecution witnesses when the prosecutor improperly prepared three witnesses by allowing them to develop false memories.

VII. The trial court erred when it admitted a redacted version of Eric Lee's former testimony.

VIII. Petitioner is entitled to relief as a result of the cumulative error of prosecutorial misconduct.

5

IX. Petitioner is entitled to relief as a result of the cumulative error of ineffective assistance of counsel.

X. Petitioner was denied the effective assistance of appellate counsel because his appellate counsel failed to raise more meritorious issues on his direct appeal, specifically, those argued in Petitioner's motion for relief from judgment.

The trial court denied the motion in an opinion and order dated March 25, 2008. The court stated that in order to demonstrate entitlement to relief, Petitioner was required to show "good cause" and "prejudice" under Mich. Ct. Rule 6.508(D)(3). Because Petitioner argued that his appellate counsel's failure to raise his substantive claims constituted cause and prejudice, the trial court proceeded to examine the merits of each of the claims. The court then found that each claim was without merit, and that Petitioner's appellate counsel was therefore not ineffective for failing to have raised them on direct appeal. The trial court concluded, "defendant has failed to satisfy the good cause prong of the two-part standard of Rule 6.508(D)(3)." Opinion, at 15.

Petitioner appealed this decision, but his application for leave to appeal was denied by the Michigan Court of Appeals "because defendant has failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." *People v. Abraham*, No. 290229 (Mich. Ct. App. June 26, 2009). Petitioner applied for leave to appeal this decision in the Michigan Supreme Court but that court also denied relief under Rule 6.508(D). *People v. Abraham*, 485 Mich. 1124 (2010)(table).

Petitioner then filed the present action, raising fourteen claims:

I. Petitioner's right not to be put twice in jeopardy was violated when the trial court declared a mistrial without his consent and without manifest necessity.

II. There was insufficient evidence to prove beyond a reasonable doubt that there was an actual conspiracy.

III. The prosecutor committed misconduct when she intimidated witness Eric Lee,

6

*which* caused him to invoke his Fifth Amendment rights.

IV. Petitioner is entitled to resentencing because he did not waive sentencing before the judge who presided over the trial.

V. There was insufficient evidence to support the prosecutor's theory that it was a 13-year conspiracy. Further, the charges prejudiced him because they were brought after the statute of limitations had expired.

VI. The trial court erred when it admitted statements that Petitioner made to law enforcement in violation of his constitutional rights. Additionally, any interrogation was in violation of Miranda because Petitioner never waived his rights.

VII. Petitioner was denied his right to be present at a critical stage when his trial counsel waived his right to be present for oral argument, discussion of jury instructions, and discussion of notes from the jury during deliberations.

VIII. The trial court erred when it admitted the testimony of multiple witnesses because their testimonies were purely hearsay and they prejudiced him.

IX. The police committed misconduct when they failed to distinguish between Petitioner and his brother and when they lied about the color of the box that the police dog alerted to. Further, the prosecutor committed misconduct by failing to correct the testimony.

X. Petitioner was denied his right to confrontation and cross examination of prosecution witnesses when the prosecutor improperly prepared three witnesses by allowing them to develop false memories.

XI. The trial court erred when it admitted a redacted version of Eric Lee's former testimony.

XII. Petitioner is entitled to relief as a result of the cumulative error of prosecutorial misconduct.

XIII. Petitioner is entitled to relief as a result of cumulative error of ineffective assistance of counsel.

XIV. Petitioner was denied the effective assistance of appellate counsel because his appellate counsel failed to raise more meritorious issues on his direct appeal, specifically, those argued in Petitioner's motion for relief from judgment.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state-court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)-(2).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,'and 'demands that state-court decisions be given the benefit of the

8

doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)((quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).   "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).   Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*.

"[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)).   Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford*, 537 U.S. at 24.  In order to obtain habeas relief in federal court, a state prisoner is required to show that the

state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

III.

A.

Petitioner's first claim asserts that his double jeopardy rights were violated when the trial court declared a mistrial after the jury announced that it could not reach a verdict after his first trial. Respondent asserts that the claim was reasonably rejected on the merits by the Michigan Court of Appeals.

When a judge discharges a jury on the grounds that the jury is unable to reach a verdict, the Double Jeopardy Clause does not prohibit a new trial for the defendant before a new jury. *Renico v. Lett*, 130 S. Ct. 1855, 1862-63, 176 L. Ed. 2d 678 (2010) (citing *United States v. Perez*, 22 U.S. 579, 580 (1824)). A trial judge's belief that a jury is "genuinely deadlocked" has "long [been] considered the classic basis for a proper mistrial." *Arizona v. Washington*, 434 U.S. 497, 509 (1978). Moreover, a trial judge should be "accorded great deference by a reviewing court" in deciding whether a jury is deadlocked. *Washington*, 434 U.S. at 510.

The Supreme Court has "expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial." *Renico*, 130 S. Ct. at 1863. The Supreme Court, in fact, has "never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the

10

impasse." *Id.* at 1864. Most significantly, the Supreme Court has never "overturned a trial court's declaration of a mistrial after a jury was unable to reach a verdict on the ground that the 'manifest necessity' standard had not been met." *Id.* (quoting *Winston v. Moore*, 452 U.S. 944, 947 (1981) (Rehnquist, J. dissenting).

In *Renico v. Lett*, the Supreme Court held that the Michigan Supreme Court's affirmance of the state trial court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached." *Id.* at 1864-65.

Given this legal backdrop, the conclusion by the Michigan Court of Appeals that Petitioner's double jeopardy rights were not violated was reasonable. The state court record shows that the jury began their deliberations after Petitioner's first trial at 5:00 p.m., on May 4, 2000. The jurors were dismissed fifteen minutes later. Deliberations began again the next morning at 9:00 a.m., and continued the whole day. On the next trial day, May 8, 2000, the jury resumed deliberations in the morning, and just before noon they sent a note to the trial court indicating that they were deadlocked. The trial court read the jury the standard "deadlocked jury" instruction, and ordered the jury to resume their deliberations. After about another half-hour of deliberations, the jury sent out another note indicating that their efforts to resolve the deadlock had failed and that "we feel no further deliberations will result in a verdict." The trial court, over Petitioner's objections, then declared a mistrial.

These facts are more favorable to the State than those in *Renico*. There, the jury had only

deliberated for a few hours, and a mistrial was declared without any meaningful attempt by the trial court to see if further deliberations would result in a verdict. No deadlocked jury instruction was read, and the trial court declared a mistrial immediately after the foreperson said he did not think they would be able to reach a verdict. Here, on the other hand, the jury deliberated for a day and one-half, the trial court instructed the jury to continue its deliberation after the first indication of a difficulty, and then it only declared a mistrial after it received a second note explaining that attempts to resolve the deadlock had failed. Petitioner does not point to any facts in his case that distinguish it from *Renico.* If the state court decision in *Renico* did not constitute an unreasonable application of established law, then neither did its decision in this case. Petitioner's first habeas claim therefore does not provide a basis for granting habeas relief.

B.

Petitioner's second habeas claim asserts that there was constitutionally insufficient evidence to sustain his conviction. Specifically, he asserts that there was no evidence offered at his trial to prove that he engaged in a conspiracy to possess cocaine with an intent to deliver it, but that the evidence only showed that he had a buyer-seller relationship with the individuals who possessed and delivered the cocaine.

The Michigan Court of Appeals determined that the prosecution produced sufficient evidence to demonstrate that Petitioner was engaged in the conspiracy. The relevant question on habeas corpus review of a legal sufficiency claim "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation omitted) (emphasis in original).

12

> *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1,  , 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Ibid.* (quoting *Renico*, 130 S. Ct. 1855, 1862(2010)).

*Coleman v. Johnson*, 566 U.S.  ,  , 132 S. Ct. 2060, 2062, 182 L. Ed. 2d 978 (2012) (per curiam); *see Nali v. Phillips*, 681 F.3d 837, 841 (6th Cir. 2012) (explaining that the *Jackson* standard "requires deference to the jury's verdict and to the state court's review of that verdict").

To establish the elements of conspiracy to possess with intent to deliver cocaine, the prosecution must "prove that (1) the defendant possessed the specific intent to deliver the statutory minimum as charged, (2) his coconspirator possessed the specific intent to deliver the statutory minimum as charged, and (3) the defendant and his coconspirator possessed the specific intent to combine to deliver the statutory minimum as charged to a third person." *People v. Hunter*, 466 Mich. 1, 6-7 (2002). "Direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties. Inferences may be made because such evidence sheds light on the coconspirators' intentions." *People v. Justice*, 454 Mich. 334, 349 (1997).

Petitioner's argument centers on the last element. He notes that under Michigan law, a mere buyer-seller relationship does not satisfy the elements because "an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy where the crime is of such a nature that it necessarily requires the participation of two persons for its commission." *People v. Clifton*,

13

70 Mich. App. 65, 67 (1975). Because the simple delivery of cocaine requires two persons, for there to be a criminal conspiracy the parties to the delivery must be part of a conspiracy to deliver the drugs to a third party. *People v. Moss*, 464 Mich. 615, 629-630 (2001).

The prosecutor's theory was that the cocaine transactions between Petitioner and Lee and Garvin were part of a conspiracy to distribute cocaine from an east coast drug organization to street level dealers. The theory was supported by Petitioner's statement to police, where he admitted that he had an on-going relationship with four named members of a Dominican organization from out of state. He stated that he would page them and a few days later he would receive cocaine from them in exchange for money. He admitted to receiving a couple of shipments a week for a period of two to three years. Petitioner boasted that about 200 kilograms of cocaine passed through his hands in this way over the course of the relationship. Petitioner told police he would sell the cocaine he received from the Dominicans to the Lee organization in Pontiac and to Garvin. The confession was corroborated by Lamark Northern, Antonio Jones, and Joseph Stines, who witnessed some of the individual transactions. The amounts of cocaine it issue here are far beyond what could be considered for personal use. Therefore, viewing this evidence most favorably to the prosecution, a rational juror could find beyond a reasonable doubt that all the parties involved–from the members of the Dominican organization, through Petitioner, to his buyers–were part of an agreement to deliver in excess of 650 grams of cocaine. *See United States v. McCullough*, 457 F.3d 1150, 1160 (10th Cir. 2006); *United States v. Castro*, 15 F.3d 417, 419-20 (5th Cir. 1994); cf. *United States v. Stallings*, 194 Fed. Appx. 827, 832 (11th Cir. 2006) (evidence sufficient to establish a single conspiracy, rather than multiple conspiracies, where evidence showed substantial overlap between the participants connected to the common goal of the conspiracy).

14

The decision of the Michigan Court of Appeals rejecting this claim on the merits therefore did not involve an unreasonable application of clearly established Supreme Court law.

C.

Petitioner's third claim asserts that the prosecutor committed misconduct when she withdrew an immunity agreement from Eric Lee and threatened to charge him with perjury if he testified at trial that he fabricated his earlier testimony regarding his knowledge of his uncles' drug operations. Petitioner alleges that the intimidation resulted in admission of Lee's preliminary examination testimony, in which Lee implicated Petitioner in the conspiracy.

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Parker v. Matthews*,     U.S.    , 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32, (June 11, 2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, (1974)). Prosecutors are prohibited from improperly threatening a defense witness with a perjury prosecution. *See Webb v. Texas*, 409 U.S. 95, 97-98 (1972). But "*Webb*..does not stand for the proposition that merely warning a witness of the consequences of perjury demands reversal." *United States v. Pierce*, 62 F. 3d 818, 832 (6th Cir. 1995). In fact, a prosecutor "has an obligation to warn unrepresented witnesses of [that] risk." *Id.* Finally, to establish a claim of witness intimidation, a defendant must demonstrate "government conduct which amounts to substantial interference with a witness's free and unhampered determination to testify" and must prove that any inappropriate conduct was not harmless. *United States v. Foster*, 128 F. 3d 949, 953 (6th Cir. 1997). This Court must ask whether

15

the Michigan Court of Appeals' decision (which, despite finding the claims not properly preserved, nevertheless, denied them on the merits), denying Petitioner's prosecutorial misconduct claims "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker*,132 S. Ct. at 2155, (quoting *Harrington*, 131 S. Ct. at 786-87.

The record reasonably supports the Michigan Court of Appeals' determination that the prosecutor's actions did not substantially interfere with Lee's desire to testify. Lee's testimony at both the grand jury proceeding and the first preliminary examination inculpated Petitioner, and was procured, in part, because of an immunity agreement. When Lee testified at co-defendant Nathaniel Lee's preliminary examination, however, he claimed a complete lack of memory of all the events he had previously testified to. Lee explained his dilemma to the court, belying his claim that he genuinely suffered from a sudden loss of memory. He explained that he had been threatened by the defendants' family if he continued to testify against them, but he was also threatened with prosecution if he refused to testify. Lee's solution was to claim he no longer remembered anything. The prosecutor viewed this feigned memory loss as a breach of the immunity agreement, and so she withdrew it. As a result, Lee was advised by his counsel to invoke his Fifth Amendment privilege against self-incrimination at Petitioner's trial.

Given this backdrop, the prosecutor's act of withdrawing from the immunity agreement did not amount to improper interference with Lee's desire to testify. Although Lee now claims in an affidavit that he would testify that he fabricated his earlier testimony against the defendants, from the record it appeared that Lee was unwilling to testify at all in light of his claimed memory loss. There is no record evidence that Lee had abandoned his memory-loss claim at the time of

16

Petitioner's trial. Furthermore, Lee was fully cross-examined by Petitioner's co-defendant's attorney at the preliminary examination, and that cross-examination was read to the jury at Petitioner's trial along with the rest of his prior testimony. It was at least reasonable for the state court to conclude that the prosecutor did not withdraw from the agreement to prevent Lee's testimony, but rather, did so because Lee had breached his agreement.

Accordingly, Petitioner has failed to demonstrate how his due process rights were violated by the conduct of the prosecutor or that the Michigan Court of Appeals decision "was so lacking in justification that there was an error well understood an comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 132 S. Ct. at 2155.

### D.

Petitioner's fourth claim asserts that he is entitled to resentencing because he was sentenced by a visiting judge instead of the judge who presided during his trial.

While state law generally requires the same judge who presided over a trial to be the one who sentences the defendant, the requirement only applies if the judge is "reasonably available." *People v. Pierce*, 158 Mich. App. 113, 115-116 (1987). Petitioner does not identify any federal authority supporting such a rule, nor has the Court located any such authority. A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68,(1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner simply has not shown why it rises to the level of a federal

constitutional violation for him to be sentenced by a judge who did not preside over his trial.  C.f. *Harvey v. Jones*, 2008 U.S. Dist. LEXIS 60703 (W.D. Mich. Aug. 8, 2008).  Accordingly, the claim does not provide a cognizable basis for granting habeas relief.

E.

The remainder of Petitioner's claims were first presented to the state courts in his motion for relief from judgment and the appeal that followed its denial.  Respondent asserts that this Court may not review the claims because Petitioner procedurally defaulted the claims by failing to raise them in the state courts during his direct appeal.

Federal habeas relief is precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is adequate and independent. *See White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). The last-explained, state-court judgment should be used to make that determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

The Sixth Circuit recently held that  the form orders used by the Michigan appellate courts in this case are unexplained because they are ambiguous as to whether they refer to a procedural default or the denial of right on the merits. *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010). This Court must therefore look to the last reasoned, state court opinion to determine the basis for the state court's rejection of Petitioner's claims. *Id.*

18

In considering and denying Petitioner's Motion for Relief From Judgment, the Oakland County Circuit Court judge, after reciting the "cause and prejudice" standard under Michigan Court Rule 6.508(D)(3), found that Petitioner had failed to satisfy the "cause" requirement because Petitioner had failed to demonstrate that his appellate counsel was ineffective for failing to raise his new claims during his direct appeal. In making this determination that counsel was not ineffective, the trial court found that the underlying substantive claims were not meritorious. By addressing the prejudice of an ineffective assistance of counsel claim in this manner, however, a court does not bind itself into ruling on the claim's underlying merits. *See Lott v. Coyle*, 261 F.3d 594, 612 (6th Cir. 2001). Accordingly, the manner in which the state trial court conducted its anlysis, though it resembled a merits review, still constituted a procedural default. *Davie v. Mitchell*, 547 F.3d 297, 313 (6th Cir. 2008) ("Although the determination of whether appellate counsel was ineffective for failing to raise a substantive claim may, in some cases, involve an inquiry into the merits of the underlying substantive claim, the fact remains that the two claims are 'analytically distinct' for purposes of the exhaustion and procedural default analysis in habeas review."); *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

Because the trial court judge denied Petitioner post-conviction relief based on the procedural grounds stated in Michigan Court Rule 6.508(D)(3), Petitioner's post-conviction claims are procedurally defaulted. *See Ivory v. Jackson*, 509 F.3d 284, 292-93 (6th Cir. 2007); *see also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). Petitioner's remaining substantive habeas claims are therefore procedurally defaulted.

With respect to his post-conviction claims, Petitioner alleges ineffective assistance of appellate counsel as cause to excuse his procedural default. Petitioner has not shown that appellate

19

counsel was ineffective. It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The United States Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 463 U.S. at 754.

Moreover, "a brief that raises every colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular,'—in a verbal mound made up of strong and weak contentions." *Jones*, 463 U.S. at 753 (citations omitted).

The Supreme Court has subsequently noted that:

> Notwithstanding *Barnes*, it is still possible to bring a *Strickland* [*v. Washington*, 466 U.S. 668 (1984) ] claim based on [appellate] counsel's failure to raise a particular claim [on appeal], but it is difficult to demonstrate that counsel was incompetent.

*Smith v. Robbins*, 528 U.S. 259, 288(2000).

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536(1986) (quoting *Jones*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a

reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003) (citing *Smith*, 477 U.S. *at 536*).

Petitioner has failed to show that appellate counsel's performance fell outside the wide-range of professionally competent assistance by omitting the claims that he raised for the first time in his Post-Conviction Motion  for Relief from Judgment. Appellate counsel filed an appellate brief, raising what he believed to be the strongest of Petitioner's arguments, including the claims that still form Petitioner's lead issues in the present case. It was a tactical decision on the part of appellate counsel as to which issues to raise on direct appeal. Petitioner has not shown that appellate counsel's strategy in presenting those claims and not raising other claims was deficient or unreasonable. Moreover, for the reasons stated by the Oakland County Circuit Court in rejecting Petitioner's Post-Conviction Motion, none of the claims raised by Petitioner in his Post-Conviction Motion were "dead bang winners." Because the defaulted claims are not "dead bang winners," Petitioner has failed to establish cause for his procedural default. *See McMeans v. Brigano*, 228 F.3d 674, 682-83 (6th Cir. 2000).

Petitioner has failed to show cause to excuse his default of the claims that he raised for the first time on state post-conviction review. Because he has not demonstrated any cause for his procedural default, it is unnecessary for the Court to reach the prejudice issue. *Smith*, 477 U.S. at 533.

Additionally, Petitioner has not presented any new reliable evidence to support any assertion of innocence which would allow this Court to consider these claims as grounds for habeas review, in spite of the procedural default. Because he has not presented any new reliable evidence that he is innocent of these crimes, a miscarriage of justice will not occur if the Court declines to review his

21

procedurally-defaulted claims on the merits. *See Johnson v. Smith*, 219 F. Supp. 2d 871, 882 (E.D. Mich. 2002) (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). Thus, Petitioner is not entitled to habeas relief on his procedurally defaulted claims or his ineffective assistance of appellate counsel claim.

## IV.

Before  Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll.§ 2254.

Petitioner has not demonstrated a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that Petitioner should not be granted leave to proceed in forma pauperis on appeal, as any appeal would be frivolous. See Fed. R. App. P. 24(a).

V

Accordingly, it is ORDERED that the petition for writ of habeas corpus is DENIED.

It is further ORDERED that a certificate of appealability is DENIED.

It is further ORDERED that permission to proceed in forma pauperis on appeal is DENIED.

_____
Paul. D. Borman
United States District Judge

Dated: 9-17-12